## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF
## ILLINOIS

| | |
|---|---|
| SECURITY PEOPLE, INC. d/b/a DIGILOCK<br><br>Plaintiffs,<br><br>v.<br><br>TRITEQ LOCK & SECURITY, LLC,<br><br>Defendant. | Civil Action No. 25-13450<br><br>**Jury Trial Demanded** |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Security People Inc. d/b/a Digilock ("Plaintiff" or "Digilock") files this Complaint for patent infringement against Defendant TriTeq Lock & Security LLC ("Defendant" or "TriTeq") alleging as follows:

### NATURE OF THE ACTION

Plaintiff Digilock brings this action for patent infringement under the patent laws of the United States, 35 U.S.C. *et seq.*, and under the jurisdiction of this Court. Digilock innovated and created the market for electronic "cam locks," which are electronic locks that fit the standard lock openings in lockers, cabinets, and other furniture. It owns numerous domestic and foreign patents directed to electronic cam locks. Defendant TriTeq, without authorization, has made, used, offered for sale, sold, and/or imported infringing products and/or services within this District and elsewhere, thereby violating Digilock's exclusive patent rights. That unlawful conduct has caused Digilock to suffer substantial harm, including lost market opportunities and damages. Digilock seeks monetary compensation and a permanent injunction for this unauthorized use of its patented technology.

## THE PARTIES

1.       Plaintiff Security People Inc. d/b/a Digilock is a corporation organized and existing under the laws of the State of Texas, with a principal place of business at 3367 North Sam Houston Pkwy W, Houston, Texas 77038.

2.       Defendant TriTeq Lock & Security LLC is a limited liability company organized and existing under the law of the State of Illinois, with a principal place of business at 701 Gullo Road, Elk Grove Village, Illinois 60007.  Upon information and belief, MicroIQ is a division of TriTeq.

3.       Digilock made a good faith effort to resolve this dispute with TriTeq, which started with an initial conferral with counsel for TriTeq and an offer of settlement. But TriTeq rejected the offer out of hand.  Then, the principle decisionmakers of each party and their counsel met.  Digilock offered another proposal, including with an option for TriTeq to propose a counteroffer.  But TriTeq rejected that offer too and the parties' conferrals ceased.  So, Digilock is forced to file this complaint as a final resort.

## JURISDICTION AND VENUE

4.       Federal question jurisdiction is conferred to this Court under 28 U.S.C. §§ 1331 and 1338(a), because this is an action for infringement of a United States patent under 35 U.S.C. §§ 271, *et seq*.

5.       TriTeq is subject to personal jurisdiction in this Court because it conducts substantial business in Illinois.  For example, (i) TriTeq maintains an office in the State of Illinois; (ii) it is registered with the Illinois Secretary of State as a limited liability company that is authorized to do business within Illinois, and has appointed a registered agent in Illinois; (iii) it regularly does, conducts and/or solicits business in Illinois; (iv) it has at least minimum contacts within Illinois; (v) it has purposefully availed itself of the

privileges, protections and benefits of conducted business in Illinois; (vi) at least some of TriTeq's activities from which this action arises, including acts of infringement, occurred within Illinois; and (vii) it derives substantial revenue from goods, products and/or services provided to residents of Illinois.

6.     In addition, venue is proper in this District under 28 U.S.C. §§ 1391 and 1400(b), because TriTeq maintains an office with employees in Illinois and it has committed acts of patent infringement here.  *See Contact*, TRITEQ, https://triteqlock.com/contact.html (last visited Nov. 3, 2025).  Moreover, upon information and belief, TriTeq, directly and/or through intermediaries, sells, distributes, makes, uses, imports, offers for sale and/or advertises infringing products or services within this District, and has many customers within this District and Illinois.

**FACTS**

**A.  Rise of Digilock**

7.     Since its founding in Northern California in 1981, Digilock has become recognized as a global leader in keyless lock solutions.  Those solutions have experienced industry-wide acceptance due to their robustness, ease of use, and elegant design. Digilock's product lines and innovations include electronically-operated locking devices for lockers, cabinets, and other furniture.  These products are featured in the locker rooms of numerous professional and collegiate athletic teams, offices of well-known corporations, and even on lockers in the coatroom of the Louvre.  Digilock offers multiple access configurations including keypad, electronic key, RFID and BLE, and most recently via a cellular telephone app.  Digilock further offers a software package that connects to the locks wirelessly from anywhere in the world through a cloud-based system to provide enhanced security and convenience.  Over the last four decades, Digilock has been

awarded approximately 300 utility and design patents across the world that are directed to security technologies. All Digilock products are overseen by an in-house engineering team and company-owned manufacturing facilities.

### B. Development of the Innovative Digilock Cam Locks

#### 1) Prior Art Mechanical Cam Locks

8.     Prior to Digilock's innovations, relatively simple mechanical lock mechanisms known as "cam locks" were used to secure furniture items such as metal and wood file cabinets, desk and cabinet drawers, locker doors, access panels and doors, mailboxes, and dispensers. These mechanical cam locks came in two forms: (1) fixed plug, and (2) removable plug.

9.     In a fixed plug cam lock, the cam lock includes a cylinder unit that is typically mounted in a ¾ inch diameter D-shaped or double D-shaped hole in a panel such as a drawer front. The cylinder unit includes a plug axially fixed therein, but which is rotatably disposed therein. On the front side of the plug is a keyhole, and, at the back side of the cylinder unit is a metal blade or arm—commonly called a "cam." When a user inserts a key into the keyhole in the plug, the user can then turn the plug within the cylinder, thereby rotating the cam from a position disengaged from surrounding cabinet hardware to a position of engagement in a slot or behind a ledge of the surrounding cabinet hardware. Other locks, such as those for desk drawers—commonly referred as "cabinet locks"—involve a camming-type action when the key and plug are rotated. The rotation causes a deadbolt to move linearly to a locking or unlocking position; or in the case of a spring-loaded latch or deadlatch, the rotation causes the cam to move a latch or deadlatch to unlocking position. While the plug is rotatable within the cylinder unit, it is axially fixed, and a user is unable to remove it. To change out the keying, the entire

4

cylinder must be removed from the furniture item. The following is a typical fixed plug cam lock:



10.     While this design is effective, it is cumbersome to remove and re-install if a user loses a key. First, the cam blade must be taken off the back. Second, the nut on the cylinder must be removed. Only then can the cylinder be removed, and the entire lock can be switched out.

11.     To allow easier key changes, companies developed the removable plug mechanical cam locks. These examples operate similarly, but the plug can be pulled out forwardly and removed, with the cylinder remaining mounted to the drawer front. A new plug can then be inserted into the cylinder which accepts a new key. The plug meets up with a connector unit rotatably disposed within the cylinder, and the connector unit is coupled to the cam blade or deadbolt. These configurations are disclosed in the prior art, e.g., US Patent Nos. 4,712,400, 5,101,649, 4,761,978, and 4,866,964.



---

[1] Series 31, CAMLOCK SYSTEMS, https://www.camlock.com/cylinders/cam-lock/series-31-cam-lock (last visited Nov. 3, 2025).
[2] US Patent No. 4,761,978, FIG.7.

### 2) Digilock Innovations

12.     Digilock identified the need for a compact, reliable, and simple-to-operate electronic lock that could replace these conventional mechanical cam locks. Its first provisional patent application was filed in May 2005, and then a corresponding utility application was filed in May 2006, which ultimately matured into US Patent No. 8,495,898 ("the '898 Patent"). A later continuation-in-part application was filed in August 2007, which matured into US Patent No. 8,490,443 ("the '443 Patent"). These patents serve as the basis for a family of patents, including without limitation: US Patent No. 9,273,492 ("the '492 Patent"), 10,909,789 ("the '789 Patent"), 10,930,099 ("the '099 Patent"), and 12,020,522 (collectively, the "Cam Lock Patents"). The Cam Lock Patents are valid and enforceable; a true and correct copy of each is attached as Exhibits A-F.

13.     Digilock is the owner of all rights and title in the Cam Lock Patents, including all rights to enforce and bring an action for infringement and to collect damages for all relevant times against infringers. Accordingly, Digilock possesses the exclusive right to enforce, and therefore, has standing to bring the present action for patent infringement.

### C. Cam Lock Patents Embodiments

14.     The Cam Lock Patents generally disclose and claim an electronic cam lock system for cabinets, drawers, drug cabinets, credenzas, sliding doors, lockers, mailboxes, and other door type applications that is compact in size, fits an existing cam lock opening and provides electronic access via a keypad or other electronic access. The lock system has electronics that release a knob or handle when the correct code is entered. In preferred embodiments, the device is long, narrow, and low in profile to fit on the margin of a steel or wood file cabinet and can be powered by batteries. The invention further contemplates a compact housing containing electronics and having a keypad, or other terminal enabling

6

entry of codes by a user, with a cam cylinder unit extending from a back side of the housing adapted to fit through a standard cam lock opening. The housing has a knob or handle on the housing for operating the cam lock manually. There are four key features disclosed among the Cam Lock Patents: (1) a fixed plug retrofitted, (2) a replaceable plug, (3) an adapter plug, and (4) internet connected electronic cam lock.

### 1) Fixed Plug Retrofitted

15. In the '789 Patent, FIG. 1 is an embodiment of the invention with a keypad cam lock which may be retrofitted to an opening where the prior art fixed plug cam lock previously resided. The lock 10 is shown secured on a surface or panel 25, with a rotatable knob or handle 12 extending from a housing 14.



FIG. 1

16. A keypad 15 is exposed at the front of the housing to allow entry. Batteries are contained within the housing 14. A slide door 24 connects with the housing to close a battery compartment. The slide door 24 may be locked to prohibit sliding to prevent unauthorized removal of batteries or tampering with the interior of the electronic lock. The electronics sit within the lock housing 14.

17. FIGS. 4 and 5 are sectional plan views of the electronic cam lock installed, in a preferred manner of installation, on a door or cabinet. The electronic cam lock 10 includes a threaded cylinder unit 26 and a nut 42 which secures the cam lock 10 to the

7

panel 40.



18.     The rotatable plug 28 of the cam lock cylinder unit 26 is shown fixed to a cam 30.  The cam is secured on the plug or rotatable member 28 via a flat 32 on the rotatable plug 28 and a corresponding hole in the cam, so that the cam is fixed against rotation relative to the plug.  Further, a nut 34 is tightened down for retention.

19.     In FIGS. 4 and 5, the handle or knob 12 connects directly with the rotatable plug 28.  The knob or handle 12 turns the plug 28 which rotates within the fixed cylinder unit 26 when permitted by the electronics.

20.     Additionally, FIG. 5 shows the electronic cam lock "locked."  The cam 30 is engaged in a slot 36 in a structure 38 adjacent to a panel 40 to which the cam lock device is secured, via a nut or threaded ring 42.  A flat 43 on the cylinder 26 matches the D-configuration, or two opposed such flats can be included.  In this way, the panel 40 may be a drawer to be pulled outwardly from the structure 38 when the lock is unlocked, or a door or cabinet or access panel.

21.     Alternatively, the cam blade 30 can be replaced with a deadbolt 88 or a slam latch 100.

22.     The fixed plug retrofitted is similarly disclosed in other Cam Lock Patents.

*See e.g.*, the '898 Patent at 4:38-5:12; 5:32-6:58 (describing FIGS. 1, 4, and 5); the '443 Patent at 4:61-5:58 (describing FIGS. 1-3); and the '492 Patent at 6:21-7:39 (describing FIGS. 1, 4, and 5).

### 2) Removable Plug Retrofit

23.    FIGS. 7 and 7A of the '789 Patent illustrate the electronic cam lock and an alternative plug-based embodiment, showing the lock both removed from and inserted into the cam lock cylinder shell to form the cylinder unit.  The plug feature of the cam lock matches the size and shape of the cam lock shell already mounted on the door, cabinet, or drawer.  In this way, the electronic cam lock can be retrofitted into the cylinder 72.  Note that the cam blade, which is mounted to the cylinder 72, is omitted from FIGS. 7 and 7A.



FIG. 7                    Fig 7A

24.    The plug 75 is a "blank" plug that will operate the lock when installed via a retainer clip or pin 81, with the electronics to control access.  The electronics housing 74 has a recess 78 surrounding the extending plug 75, shown in dashed lines, to accommodate the slightly protruding face 80 of the cylinder shell 72 as installed in the door or drawer 71.  Many of the cam locks used in furniture have this type of front-loaded plug which can also be removed for service and rekeying purposes.

25.    The connector 77 extends from an end of the cylinder plug 75 and is

operatively coupled to the locking element disposed within the cylinder shell 72 such that, upon actuation of the electronic lock, the connector 77 transmits rotational motion to the locking element to effect locking or unlocking of the cam lock.

26.     The retrofitted electronic cam lock preferably has the same operational features as the lock described above with respect to FIGS. 1, 4, and 5, the difference being that the plug 75 extends back from the unit for retrofitting into an existing cylinder 72 that previously had a conventional plug and key.

27.     The removable plug retrofit is disclosed similarly in other Cam Lock Patents. *See* the '898 Patent at 7:16-29 (describing FIGS. 7 and 7A); the '443 Patent at 5:59-6:11 (describing FIGS. 4A and 4B).

### 3) Adapter Plug

28.     An adapter plug is a moveable, interchangeable plug component that connects a drive shaft of an electronic cam lock to the locking mechanism within a cam lock cylinder and is available in different lengths to fit cylinders of varying depths. Doors and cabinets have different wall thicknesses, and so cam locks manufactured with cylinder units have different depths. In other words, when purchasing a cam lock, a user can specify the depth of the cylinder unit. Likewise, when purchasing an electronic cam lock of this invention in the preceding embodiment, the lock would include a plug 75 having a specific depth that fits a cylinder unit having a corresponding depth. Thus, a manufacturer of electronic cam locks would be required to manufacture and stock cam locks of differing plug lengths.

29.     FIGS. 13 and 14 in the '099 Patent illustrate a small but significant revision that addresses the need to produce different plug lengths for different cylinder depths. Instead of manufacturing electronic cam locks with fixed-length plugs, the invention

introduces an adapter plug system, in which interchangeable plugs of varying lengths can be used with a common electronic cam lock assembly.



FIG. 13          FIG. 14

30.     Here, instead of the plug 75 extending rearwardly from the knob 12, there is a drive shaft 102.  A plug 108 has an internal profile 106 corresponding to the cross section of the drive shaft 102.  The plug 108 is sized to work in the cylinder 104.  Accordingly, a manufacturer only needs to manufacture and stock the electronic cam lock 74a along with various adapter plugs 108 having different lengths to accommodate different depths of cylinder units.

31.     The adaptor plug is similarly disclosed in other Cam Lock Patents.  *See e.g.*, the '898 Patent at 8:28-46 (describing FIGS. 13 and 14); the '522 Patent at 10:33-54 (describing FIGS. 13 and 14); the '789 Patent at 10:30-51 (describing FIGS. 13 and 14); and the '492 Patent at 10:16-38 (describing FIGS. 13 and 14).

**4)  Internet Connected Electronic Cam Locks**

32.     For greater functionality, the electronic cam locks can be connected to the internet for remote access and control.  The lock device of the invention may include with an antenna 233 for wireless network connection.  This connection may be an Ethernet connection or Bluetooth or similar connection or both.

33.     In the '789 Patent, the cam lock units 260 and 290 shown in FIGS. 45 and 48 (similar to those of FIGS. 40A and 39A) are also equipped with a receptacle 234 for direct network connection (as an alternative to wireless), as well as a power receptacle 235 for external (line) power if required or desired.  An administrative user can access the locks via the network to control what codes have access to a series of cabinets, drawers, *etc*. Such a network will include a terminal or central control system which can simply be a microprocessor with a database listing all locks.  A laptop or handheld computer device is all that is required, or a network hub connected to a group of locks, wired or wirelessly. The end user of locks 260, 290 can use the keypad (see Fig. 45) or an, e.g., RFID input 242 (see Fig. 48) to input the unlocking code.



FIG. 45

FIG. 48

34.     With the central control a manager connects to any one lock or all locks when desired, to update which "keys" or codes will have access, and even the times of permitted access if desired.  Each lock can include a processor to receive the control signal and to set the lock's electronics to allow access by employees A, B, C and D, but not employee E, for example.

35.     The lock driver may also communicate with specially designed nodes as part of a network and receive valid access data and send audit data or maintenance data or other desired data.  This data may access programming data or data containing audit trail or usage information, as well as application specific data for the usage of the cabinet such as insertion or removal of files or other items to and from the cabinet.

36.     Additionally, the '492 Patent discloses similar internet features and figures. *See* '492 Patent at 15:38-67 (describing FIGS. 45 and 46).

**D. Digilock Practices the Claims of the Cam Lock Patents: Versa™ Locks**

37.     Digilock makes and sells electronic cam locks that practice one or more claims of the Cam Lock Patents, including its Versa™ locks.

38.     The Versa™ locks are slim, highly adaptable electronic cam locks engineered for a wide array of storage applications—ranging from drawers and pedestals to lockers and cabinets.  As described on Digilock's official site, the Versa™ locks deliver "flexible by design" security, accommodating diverse orientations (vertical or horizontal), mounting configurations (surface or recessed), and finish options.[3]

39.     A key advantage of the Versa™ locks is its retrofit capability—it can replace an existing mechanical lock without needing extensive furniture modifications.

---

[3] *See* Versa, DIGILOCK, https://www.digilock.com/products/smart-locks/versa/ (last visited Nov. 3, 2025).



40.    Additionally, it can use Digilock's cloud-based management system to allow administrators to monitor and control locks remotely, manage user credentials and access audit trails in real time.



41.    Because the Versa™ locks practice claims within the Cam Lock Patents, Digilock virtually marks its products in compliance with 35 U.S.C. § 287. *See, e.g.*, https://www.digilock.com/patents/.

### E.    The Infringing TriTeq Products

42.    TriTeq uses, causes to be used, provides, supplies, or distributes one or more electronic cam locks, including, but not limited to, include the MicroIQ UT Cam/Utility

Electronic Lock, the MicroIQ CT Electronic Lock for Haworth, and the MicroIQ ProxTraq (collectively, the "Accused Products").

**1) MicroIQ UT Cam/Utility electronic lock – Fixed Plug**

43.    According to the product description, the MicroIQ UT Cam/Utility Electronic Lock "directly replace[s] the cam locks found on desks, furniture, and office cabinets."[4]  The purported easy-to-use keypad lock can be accessed with a code and/or a key fob and it is powered by a concealed and secured low profile coin-cell battery.  The MicroIQ UT Cam/Utility Electronic Lock is depicted as follows:



44.    Upon information and belief, the UT Cam/Utility electronic lock is an electronic cam lock for a door, cabinet, or drawer in a standard cam lock size adapted to fit through a standard cam lock opening in a cabinet or door for extending therethrough. It includes a compact housing containing electronics and having a keypad or other terminal and a threaded cam cylinder unit extending from a back side of the housing with a rotatable core and locking element sitting on the cam lock cylinder unit.  After the UT Cam/Utility electronic lock is disposed on a surface, the user can operate it by using the keypad or other terminal to input an access code.  A correct access code will activate the electronics stored in the housing to permit turning of the knob.  Then, the rotatable core

---

[4] *See* MicroIQ UT Cam/Utility electronic lock, MICROIQ,
https://microiqlock.com/product/microiq-utility-lock?srsltid=AfmBOoqJrWMowdq0sIZsk8DGbabVh1BImPMPy2XQyncgNB9sm65QI17m
(last visited Nov. 3, 2025).

and locking element rotate too, locking or unlocking the surface.

### 2) MicroIQ CT Electronic Lock for Haworth – Removable/Adapter Plug

45.    According to the product description, the MicroIQ CT Electronic Lock for Haworth "directly replace[s] the core locks found on desks, furniture, and office cabinets."[5]  The purported easy-to-use keypad lock can be accessed with a code and/or a key fob and it is powered by a concealed and secured low profile coin-cell battery.  The MicroIQ CT Electronic Lock for Haworth is depicted as follows:





46.    Upon information and belief, the CT Electronic Lock is an electronic cam lock similar to the UT Cam/Utility electronic lock in its operation.  But it apparently differs in that the cam lock includes a plug extending from the back side of the housing that matches the size and shape of the cam lock shell already mounted on the door, cabinet, or drawer.  Specifically, the size and shape are of the Haworth key.  In this way, the conventional Haworth lock and key can be replaced with an electronic lock.  After installation, operation of the CT electronic lock follows the UT Cam/Utility electronic lock.  Once the cam lock is disposed on a surface, then the user can operate it by using the keypad or other terminal to input an access code.  A correct access code will activate the

---

[5] *See MicroIQ CT electronic lock for Haworth*, MICROIQ, https://microiqlock.com/product/microiq-lock-for-haworth (last visited Nov. 3, 2025).

electronics stored in the housing to permit turning of the knob. Then, the rotatable core and locking element rotate too, locking or unlocking the surface.

### 3) MicroIQ ProxTraq

47.     According to the product description, the MicroIQ ProxTraq is a cloud-based web portal and mobile application that collectively enable enterprise-wide access management of MicroIQ Prox-compatible electronic locks.[6]

48.     Upon information and belief, the ProxTraq system, in combination with MicroIQ locks, is configured to connect to the internet for remote access and control. The locks include wireless communication capability (*e.g.*, Bluetooth) and are managed through a centralized cloud-based portal that maintains a database of all locks in an organization. Using the portal, an administrator can remotely update which credentials or "keys" have access to one or more locks, control the times of permitted access, and receive audit trail information reflecting lock usage.



49.     Upon information and belief, TriTeq makes, sells, offers for sale, and imports

---

[6] *See* MicroIQ ProxTraq, MicroIQ, https://microiqprox.com/product/proxtraq/ (last

into the United States the Accused Products.

50.     Upon information and belief, TriTeq provides instructions to its customers and users of the Accused Products demonstrating how to install, set up, and use the Accused Products in the form of, at least, user manuals, product specifications, and technical bulletins available through TriTeq's website.   These resources provide instructions directed to end users of the Accused Products demonstrating use thereof in manners that infringe the Cam Lock Patents.  Use of the Accused Products in accordance with these instructions constitutes direct infringement of the Asserted Patent by end users of the Accused Products.

51.     Upon information and belief, TriTeq first learned of the Cam Lock Patents no later than July 21, 2017, during prosecution of their US Patent Application No. 14/728,996, when Digilock's own US Patent Publication No. 2007/0277571 was cited as prior art.  The '571 publication is the publication of US Patent Application NO. 11/809,172, which led to US Patent No. 8,495,898.

## COUNT I: INFRINGEMENT OF THE '789 Patent

52.     Upon information and belief, TriTeq infringes the '789 Patent under 35 U.S.C. § 271(a), including at least claims 35, 43-44, 52, and 57-58, literally and/or under the doctrine of equivalents, by making, using, offering to sell, and/or selling the Accused Products in the United States without authorization.

53.     Upon information and belief, TriTeq infringes the '789 Patent under 35 U.S.C. § 271(a), including at least claim 1, literally and/or under the doctrine of equivalents, by making, using, offering to sell, and/or selling the Accused Products in the United States without authorization.

---

visited Nov. 3, 2025).

54.     As a result of TriTeq's infringement of the '789 Patent, Digilock is entitled to monetary damages in an amount adequate to compensate for TriTeq's infringement, but in no event less than a reasonable royalty for the use made of the invention by TriTeq, together with interest and costs fixed by the Court.

55.     The balance of hardships favors an injunction under 35 U.S.C. § 283, and such injunction would not disserve the public interest.

56.     TriTeq was constructively noticed of the '789 Patent as of the issuance date, February 2, 2021, and on actual notice at least as early as April 7, 2025, when Digilock contacted TriTeq about the present dispute.

57.     Given TriTeq's knowledge of the '789 Patent, TriTeq's infringement has been, and continues to be, willful.

## COUNT II: INFRINGEMENT OF THE '099 Patent

58.     Upon information and belief, TriTeq infringes the '099 Patent under 35 U.S.C. § 271(a), including at least claim 1, literally and/or under the doctrine of equivalents, by making, using, offering to sell, and/or selling the MicroIQ UT Cam/Utility electronic lock and CT Electronic Lock for Haworth (collectively, "the MicroIQ locks") in the United States without authorization.

59.     As a result of TriTeq's infringement of the '099 Patent, Digilock is entitled to monetary damages in an amount adequate to compensate for TriTeq's infringement, but in no event less than a reasonable royalty for the use made of the invention by TriTeq, together with interest and costs fixed by the Court.

60.     The balance of hardships favors an injunction under 35 U.S.C. § 283, and such injunction would not disserve the public interest.

61.     TriTeq was constructively noticed of the '099 Patent as of the issuance date,

February 23, 2021, and on actual notice at least as early as April 7, 2025, when Digilock contacted TriTeq about the present dispute.

62.     Given TriTeq's knowledge of the '789 Patent, TriTeq's infringement has been, and continues to be, willful.

### COUNT III: INFRINGEMENT OF THE '898 PATENT

63.     TriTeq actively induces infringement of at least claims 1 and 19 of the '898 Patent by its customers and end users of at least the MicroIQ locks and is therefore liable for indirect infringement under 35 U.S.C. § 271(b).   A customer's act of installing the MicroIQ locks as described in the '898 Patent infringes at least claims 1 and 19.   TriTeq knows that its MicroIQ locks are especially designed for and marketed toward infringing use by TriTeq's customers, to implement electromechanical locking hardware and controls.   TriTeq has induced, caused, urged, encouraged, aided, and abetted its direct and indirect customers to make, use, sell, offer for sale and/or import one or more of the MicroIQ locks.

64.     Additionally, TriTeq provides step-by-step instructions for installation, setup, and use of the MicroIQ locks to operate in a manner that directly infringes, either literally or under the doctrine of equivalents, at least claims 1 and 19 of the '898 Patent.   These instructions are provided by TriTeq as user manuals and online content made available by TriTeq through its website to its customers and distributors.   For example, the MicroIQ website has a "Support" page with links to installation manuals and videos.   *See* Support, MICROIQ, https://microiqlock.com/support (last visited Nov. 3, 2025).   Such conduct by TriTeq was intended to and actually did result in direct infringement by TriTeq's direct and indirect customers, including the making, using, selling, offering for sale and/or importation of the MicroIQ locks in the United States.

65.     TriTeq contributes to the infringement of at least claims 1 and 19 of the '898

Patent by its customers and end users of at least the MicroIQ locks and is therefore liable for indirect infringement under 35 U.S.C. § 271(c). The MicroIQ locks are especially designed to provide selective access to, or to secure, surfaces like a cabinet, door, access panel, mailbox, dispenser, etc. in the manners described above infringes at least claims 1 and 19 of the '898 Patent. Upon information and belief, the MicroIQ locks have no substantial non-infringing use, as they are specifically designed and marketed for use by customers to mount an electronic cam lock to a door or panel. Setup and use of the MicroIQ locks by TriTeq's customers constitutes direct infringement, either literally or under the doctrine of equivalents, of at least claims 1 and 19 of the '898 Patent.

66.    As a result of TriTeq's indirect infringement of the '898 Patent, Digilock is entitled to monetary damages in an amount adequate to compensate for TriTeq's infringement, but in no event less than a reasonable royalty for the use made of the invention by TriTeq, together with interest and costs fixed by the Court.

67.    The balance of hardships favors an injunction under 35 U.S.C. § 283, and such injunction would not disserve the public interest.

68.    TriTeq was constructively noticed of the '898 Patent as of the issuance date, January 30, 2013, and on actual notice at least as early as July 17, 2017, during prosecution of US Patent Application No. 14/728,996, and on April 7, 2025, when Digilock contacted TriTeq about the present dispute.

69.    Given TriTeq's knowledge of the '898 Patent, TriTeq's infringement has been, and continues to be, willful.

70.    Digilock expressly reserves the right to assert additional claims of the '898 Patent against TriTeq.

**COUNT IV: INFRINGEMENT OF THE '443 PATENT**

21

71.     TriTeq actively induces infringement of at least claims 1 and 19 of the '443 Patent by its customers and end users of at least the MicroIQ locks and is therefore liable for indirect infringement under 35 U.S.C. § 271(b).  A customer's act of installing the MicroIQ locks as described in the '443 Patent infringes at least claims 1 and 19.  TriTeq knows that its MicroIQ locks are especially designed for and marketed toward infringing use by TriTeq's customers, to implement electromechanical locking hardware and controls.  TriTeq has induced, caused, urged, encouraged, aided, and abetted its direct and indirect customers to make, use, sell, offer for sale and/or import one or more of the MicroIQ locks.

72.     Additionally, TriTeq provides step-by-step instructions for installation, setup, and use of the MicroIQ locks to operate in a manner that directly infringes, either literally or under the doctrine of equivalents, at least claims 1 and 19 of the '443 Patent.  These instructions are provided by TriTeq as user manuals and online content made available by TriTeq through its website to its customers and distributors.  For example, the MicroIQ website has a "Support" page with links to installation manuals and videos.  *See* Support, MICROIQ, https://microiqlock.com/support (last visited Nov. 3, 2025).  Such conduct by TriTeq was intended to and actually did result in direct infringement by TriTeq's direct and indirect customers, including the making, using, selling, offering for sale and/or importation of the MicroIQ locks in the United States.

73.     TriTeq contributes to the infringement of at least claims 1 and 19 of the '443 Patent by its customers and end users of at least the MicroIQ locks and is therefore liable for indirect infringement under 35 U.S.C. § 271(c).  The MicroIQ locks are especially designed to provide selective access to, or to secure, surfaces like a cabinet, door, access panel, mailbox, dispenser, etc. in the manners described above infringes at least claims 1 and 19 of the '443 Patent.  Upon information and belief, the MicroIQ locks have no substantial non-infringing

use, as they are specifically designed and marketed for use by customers to mount an electronic cam lock to a door or panel. Setup and use of the MicroIQ locks by TriTeq's customers constitutes direct infringement, either literally or under the doctrine of equivalents, of at least claims 1 and 19 of the '443 Patent.

74. As a result of TriTeq's indirect infringement of the '443 Patent, Digilock is entitled to monetary damages in an amount adequate to compensate for TriTeq's infringement, but in no event less than a reasonable royalty for the use made of the invention by TriTeq, together with interest and costs fixed by the Court.

75. The balance of hardships favors an injunction under 35 U.S.C. § 283, and such injunction would not disserve the public interest.

76. TriTeq was constructively noticed of the '443 Patent as of the issuance date, July 23, 2013, and on actual notice at least as early as April 7, 2025, when Digilock contacted TriTeq about the present dispute.

77. Given TriTeq's knowledge of the '443 Patent, TriTeq's infringement has been, and continues to be, willful.

78. Digilock expressly reserves the right to assert additional claims of the '443 Patent against TriTeq.

**COUNT V: INFRINGEMENT OF THE '492 PATENT**

79. TriTeq actively induces infringement of at least claims 1 and 4-6 of the '492 Patent by its customers and end users of at least the MicroIQ locks and is therefore liable for indirect infringement under 35 U.S.C. § 271(b). A customer's act of installing the MicroIQ locks as described in the '492 Patent infringes at least claims 1 and 4-6. TriTeq knows that its MicroIQ locks are especially designed for and marketed toward infringing use by TriTeq's customers, to implement electromechanical locking hardware and controls. TriTeq has

23

induced, caused, urged, encouraged, aided, and abetted its direct and indirect customers to make, use, sell, offer for sale and/or import one or more of the MicroIQ locks.

80.     Additionally, TriTeq provides step-by-step instructions for installation, setup, and use of the MicroIQ locks to operate in a manner that directly infringes, either literally or under the doctrine of equivalents, at least claims 1 and 4-6 of the '492 Patent.   These instructions are provided by TriTeq as user manuals and online content made available by TriTeq through its website to its customers and distributors.   For example, the MicroIQ website has a "Support" page with links to installation manuals and videos.  *See* Support, MICROIQ, https://microiqlock.com/support (last visited Nov. 3, 2025).   Such conduct by TriTeq was intended to and actually did result in direct infringement by TriTeq's direct and indirect customers, including the making, using, selling, offering for sale and/or importation of the MicroIQ locks in the United States.

81.     TriTeq contributes to the infringement of at least claims 1 and 19 of the '492 Patent by its customers and end users of at least the MicroIQ locks and is therefore liable for indirect infringement under 35 U.S.C. § 271(c).  The MicroIQ locks are especially designed to provide selective access to, or to secure, surfaces like a cabinet, door, access panel, mailbox, dispenser, etc. in the manners described above infringes at least claims 1 and 4-6 of the '492 Patent.  Upon information and belief, the MicroIQ locks have no substantial non-infringing use, as they are specifically designed and marketed for use by customers to mount an electronic cam lock to a door or panel.  Setup and use of the MicroIQ locks by TriTeq's customers constitutes direct infringement, either literally or under the doctrine of equivalents, of at least claims 1 and 4-6 of the '492 Patent.

82.     As a result of TriTeq's indirect infringement of the '492 Patent, Digilock is entitled to monetary damages in an amount adequate to compensate for TriTeq's

24

infringement, but in no event less than a reasonable royalty for the use made of the invention by TriTeq, together with interest and costs fixed by the Court.

83.     The balance of hardships favors an injunction under 35 U.S.C. § 283, and such injunction would not disserve the public interest.

84.     TriTeq was constructively noticed of the '443 Patent as of the issuance date, March 1, 2016, and on actual notice at least as early as April 7, 2025, when Digilock contacted TriTeq about the present dispute.

85.     Given TriTeq's knowledge of the '443 Patent, TriTeq's infringement has been, and continues to be, willful.

86.     Digilock expressly reserves the right to assert additional claims of the '492 Patent against TriTeq.

## COUNT VI: INFRINGEMENT OF THE '522 PATENT

87.     TriTeq actively induces infringement of at least claim 1 of the '522 Patent by its customers and end users of at least the MicroIQ locks and is therefore liable for indirect infringement under 35 U.S.C. § 271(b).  A customer's act of installing the MicroIQ locks as described in the '522 Patent infringes at least claim 1.  TriTeq knows that its MicroIQ locks are especially designed for and marketed toward infringing use by TriTeq's customers, to implement electromechanical locking hardware and controls.  TriTeq has induced, caused, urged, encouraged, aided, and abetted its direct and indirect customers to make, use, sell, offer for sale and/or import one or more of the MicroIQ locks.

88.     Additionally, TriTeq provides step-by-step instructions for installation, setup, and use of the MicroIQ locks to operate in a manner that directly infringes, either literally or under the doctrine of equivalents, at least claim 1 of the '522 Patent.  These instructions are provided by TriTeq as user manuals and online content made available by TriTeq through

its website to its customers and distributors. For example, the MicroIQ website has a "Support" page with links to installation manuals and videos. *See* Support, MICROIQ, https://microiqlock.com/support (last visited Nov. 3, 2025). Such conduct by TriTeq was intended to and actually did result in direct infringement by TriTeq's direct and indirect customers, including the making, using, selling, offering for sale and/or importation of the MicroIQ locks in the United States.

89. TriTeq contributes to the infringement of at least claim 1 of the '522 Patent by its customers and end users of at least the MicroIQ locks and is therefore liable for indirect infringement under 35 U.S.C. § 271(c). The MicroIQ locks are especially designed to provide selective access to, or to secure, surfaces like a cabinet, door, access panel, mailbox, dispenser, etc. in the manners described above infringes at least claim 1 of the '522 Patent. Upon information and belief, the MicroIQ locks have no substantial non-infringing use, as they are specifically designed and marketed for use by customers to mount an electronic cam lock to a door or panel. Setup and use of the MicroIQ locks by TriTeq's customers constitutes direct infringement, either literally or under the doctrine of equivalents, of at least claim 1 of the '522 Patent.

90. As a result of TriTeq's indirect infringement of the '522 Patent, Digilock is entitled to monetary damages in an amount adequate to compensate for TriTeq's infringement, but in no event less than a reasonable royalty for the use made of the invention by TriTeq, together with interest and costs fixed by the Court.

91. The balance of hardships favors an injunction under 35 U.S.C. § 283, and such injunction would not disserve the public interest.

92. TriTeq was constructively noticed of the '522 Patent as of the issuance date, March 1, 2016, and on actual notice at least as early as April 7, 2025, when Digilock

26

contacted TriTeq about the present dispute.

93.     Given TriTeq's knowledge of the '522 Patent, TriTeq's infringement has been, and continues to be, willful.

94.     Digilock expressly reserves the right to assert additional claims of the '522 Patent against TriTeq.

**PRAYER FOR RELIEF**

Plaintiff requests that the Court find in its favor and against Defendant and grant Plaintiff the following relief:

> a.   Judgment that one or more claims of the Asserted Patents have been directly infringed, either literally or under the doctrine of equivalents, by Defendant, or judgment that one or more of the claims of the Asserted Patents have been directly infringed by others and indirectly infringed by Defendant, where Defendant contributed to or induced such direct infringement by others;

> b.   Judgment that Defendant and its subsidiaries, affiliates, officers, directors, agents, servants, employees, successors, and assigns and all other persons and organizations in active concert or participation with them, be preliminarily and permanently enjoined from further acts of infringement under 35 U.S.C. § 283;

> c.   Judgment that Defendant account for and pay to Plaintiff all damages to and costs incurred by Plaintiff because of Defendant's infringing activities and other conduct complained of in this complaint, including enhanced damages as permitted under 35 U.S.C. § 284;

> d.   Judgement that Defendant's infringement is willful from the time

Defendant was made aware of the infringing nature of its products and methods and that the Court award treble damages for the period of such willful infringement under 35 U.S.C. § 284;

e.   That Plaintiff be granted pre-judgment and post-judgment interest on the damages caused by Defendant's infringing activities and other conduct complained of in this complaint;

d.   That the Court declare this an exceptional case and award Plaintiff its reasonable attorney's fees and costs in accordance with 35 U.S.C. § 285; and

e.   That Defendant, its officers, agents, servants and employees, and those persons in active concert and participation with any of them, be permanently enjoined from infringement of one or more claims of the Asserted Patents or, in the alternative, if the Court finds that an injunction is not warranted, Plaintiff requests an award of post judgment royalty to compensate for future infringement;

f.   That Plaintiff be granted such other and further relief as the Court may deem just and proper under the circumstances.

### JURY DEMAND

Digilock demands a jury trial under the Federal Rules of Civil Procedure, Rule 38.

Dated: November 3, 2025         Respectfully submitted,

  */s/Adam G. Kelly*

Adam G. Kelly
Sophia D. Gunzburg
VENABLE LLP
227 West Monroe Street, Suite 1900
Chicago, Illinois 60606
Telephone: (312) 820-3400
Email: agkelly@venable.com
Email: sdgunzburg@venable.com

Jonathan L. Ko (*pro hac vice* forthcoming)
VENABLE LLP
2049 Century Park East, Suite 2300
Los Angeles, CA 90067
Telephone: (310) 229-9900
Email: jlko@venable.com

*Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

Plaintiff's counsel will attempt to serve Defendant under 4(d)(1).

/s/Adam G. Kelly
_____